behalf of the defendant's appellant Mark Kirsch, I want as an initial matter to mention that my client is present in the courtroom today. Consider my left, your right. Judge Scragney continued his release pending appeal and that enables him to be here today. Almost seven years ago now, Magistrate Judge Hugh B. Scott in the Western District of New York recommended that the indictment against Mark Kirsch be dismissed in its entirety. The district court did not adopt that recommendation at the time. After a series of decisions by the district court, a jury's verdict, and an order granting Mr. Kirsch's Rule 29 motion in part, we are here to ask this court to finally dismiss the last and firm two remaining charges against him, the two counts of conviction. What remains are just two counts out of what had been a seven count indictment that included a sprawling RICO charge on count one that had 11 racketeering acts, some 17 sub-predicate racketeering acts. So I understand your argument about your Edmonds argument so far as it relates to unionization. I don't understand it with respect to the prong of hiring someone who was totally unnecessary, where they didn't even have a prior employee. It would not apply if we were asking if Mr. Kirsch had sought to have somebody employed who was totally unnecessary. But in this case, the proof was that both Ontario Specialty Contracting and EarthTech, the two complainant or victim companies in racketeering acts 4B and 5B in count one, both of them were seeking employees to do the work that was required on his job site. And the union employees that would have done that work, had those employers signed with the union, would have done work that was necessary. I understand all that, but there's the count about the... Amstar. Yeah. So that is the one transaction in count two that survived the Edmonds challenge. It's a Hobbs Act allegation. And there, the argument is not that Edmonds settles that score. There, the argument is that there was nothing, no proof of trial, not a scintilla of evidence that connected Mark Kirsch to that event. You had a single witness testify, Mr. Lignos. Mr. Lignos was with Amstar Painting. It was a union contractor. And Mr. Lignos testified that Mr. Perkins came to him one day. Mr. Perkins was a member of the union, member of Local 17, not an officer, not a business agent, not an emissary for Mr. Kirsch. He was a member of the union, and he said that he asked, Mr. Lignos said that Mr. Perkins asked that an employee, that an operator be assigned to a certain piece of equipment, a compressor. Mr. Lignos very clearly said there was no threat, there was no demand, just asked. This is the North Suburban Act. The North Suburban Act comes into this, of course, because under that statute, they would have to, it's exactly right. I can't tell you that the North LaGuardia statute was argued below, although I think it probably was, and I apologize that I can't be categorical about that. There were motion after motion after motion challenging these charges, and I apologize that I can't be certain. What I am certain, though, Judge, is that we challenged the sufficiency of the evidence on count two. That was a key argument. So you didn't ask for a jury instruction on the North LaGuardia? No, I don't think we asked for a jury instruction on it. But it is the law, and it does apply to this challenge. And even without the North LaGuardia Act, that sort of gilds the lily. But even without that, you have zero, and I can't say this strongly enough, zero evidence at trial to connect Mr. Because that had nothing to do with Amstar. It wasn't connected to that single event. And so, if I had any, you would be? That would only be supposition, Judge, and that wouldn't be enough. There was no testimony that Mr. Perkins ever heard that Mr. Perkins didn't testify. So there's no evidence that Mr. Perkins was responding to anything, anything, any message, any tone, any importunment. Nothing that came from Mr. Kirsch was ever related to Mr. Perkins. All we have is Mr. Lignos' testimony, and Mr. Lignos from Amstar Painting simply said, Perkins came to me and he said, hey, would you put an operator on this compressor? That's it. Nothing else. So if we were to look at that other testimony, and it brings up a good point, Judge, there were weeks and weeks and dozens of witnesses that testified ostensibly in relation to count two. All of that testimony ultimately was determined to be not relevant. It is a conspiracy, Judge. Well, first of all, Turner Burn is not to say, do whatever you can to extract whatever you can. That was a phrase that came out of union training that came from the National, and it simply, it actually referred to putting pressure, lawful pressure, like pickets, like salting operations, all the lawful machinations that unions are allowed to do to put pressure on employees to turn them, to put them, to get them to sign union contracts. Not by Mr. Kirsch, it wasn't. I mean, there may have been testimony from Mr. Minter or Mr. Larson. Again, because there's nothing that connects any of those statements, any of that testimony, there's nothing to tell us that Mr. Perkins ever heard that or knew that from Mr. Kirsch. And, Judge, you just have to go back to it, because count two is a circumstantial count, you just have to go back to the Glenn standard. You have circumstantial proof, equally consistent with innocence as with guilt, and a jury would have to find. Sure, Judge. So, CCAR is about transferable property, and it's not a completely new concept. We had that in Shidler. Judge, I see I'm within two minutes. Okay. So, we had the idea of transferable property in Shidler case, but then in 2013, we got CCAR. And CCAR emphasized that transferable property means something that can be actually, you know, taken by the recipient and exercised or used. And you didn't have this here. In count one, what you have are union contracts. These contracts don't exist. And what Mr. Kirsch was trying to get was for these two companies to sign with the union. It's exactly what he's supposed to do as the president of Local 17. He was trying to get these companies to sign with the union. That's their decision, just like the recommendation of the defendant in SECAR. It's their decision whether or not to sign with the union, or to sign with a non-union heavy equipment operating company. That kind of decision is not transferable under CCAR. In count two, it's a little more subtle, and it's a little bit tougher of a case, but I still think that under CCAR, you do not have transferable property. The indictment talks about wages, and wages, first blush, might seem like the kind of thing that's transferable. It's like dollars and cents, right, that you get your paycheck. But these wages in this indictment, these are future wages. These are wages that would be earned under agreements with the union. No, I don't think so, Judge. I mean, every one of the cases dealing with— No, sometimes you've got actual dollars and cents, and obviously those are transferable. Sometimes you've got current—I see my time is up. Can I finish my response, Judge? Sometimes you've got current wages that are owed to an employee, and there's a demand for them. That would be transferable property. Here, this future economic benefit—and I think that phrase is discussed in CCAR, one of its progeny— future economic benefit is prospective, maybe down the road kind of a thing. That's not transferable property. So CCAR, I think, dooms count too, as well. Why was it written in Article 20 against our OVERDATE procedure, Article 176, OVERDATES, and saving the jurors' employment? No, that came under Rule 29. It was after the jurors' verdict, Judge. And it was because in every other OVERDATE, every other transaction, every other allegation, the allegation was that the union was seeking to have union workers work under a union contract and provide actual work for work that was needed and that was therefore not superfluous, was not fictitious. The Amstar—Amstar, at least arguably, because Mr. Ligo specified he didn't need an operator on that compressor, Amstar arguably survived Fat Edmund's argument, but fails for all the other reasons we've talked about. Thank you. May it please the Court, I'm Monica Richards, on behalf of the United States of America, appellee. I'm going to start at the end. Mr. Melber started at the beginning of the case with the report and recommendation by the magistrate judge. I'm going to start at the end, where the sentencing—at sentencing, the district court judge noted that this was a long-term, long course of conduct, that this defendant had a leadership role in it, that he committed perjury while he was on the stand, and that his leadership was contrary to the spirit of the time-borrowed honorary tradition in the country of bettering conditions through organized worker activities. The leadership created a climate for employers and union workers in businesses that unfairly interfered with the employers and contractors and the desire and ability to want to do business in western New York. So that here— Those are eloquent words, but they don't have any application to any of the issues in this case, do they? They certainly do, Your Honor. Why? They're not—it's the jury's conviction that we're concerned with, not the judge's sentencing. Right. He's reiterating what was found by the jury, that the jury found that this was an unreasonable, unlawful interference with the commercial activity of these employers, so that the undue influence that was placed on the employers— So with respect to two of the employers, the actions were being taken in order to try to unionize, yes? I'm not sure that I follow that, but no, I believe it was pressure on the employers, not— That's what I'm saying. Pressure on the employers to unionize. Well, that's different. I'm sorry if I heard it differently, but it's, to my mind, pressure on the employees to unionize. It's pressure on the employers to hire the union. Okay, either way, why isn't that protected activity under Edmonds? Because we don't have a collective bargaining agreement here. We're pre-collective bargaining agreement. Would we, any law— What in Edmonds says it's limited to a collective bargaining agreement? The fact in Edmonds what says that? In Edmonds, it was all— I'm talking about the decision by the Supreme Court. Edmonds has never been extended beyond a strike context, John. Is that so true? Did you take a look, for example, at United States v. Jackson, which is a decision of the circuit at 180 F. 3rd 55, where the same claim of right analogy was extended to a similar extortion statute on the theory that the use of the word wrongful imports into any such statute a requirement that the misconduct not simply be taken in support of a legitimate legal claim of right? And isn't this a legitimate legal claim of right? No. Why not? Because they don't have— In this case, I guess my analogy is that it's as if a group of people who lived on the same block in a certain location in the city decided that they wanted to work on that job that's happening on the other block. And they went up to the employer and they said, you hire us or else we're going to blast your equipment. We're going to threaten and sue—threaten to hurt your wives. We're going to find out where you live and create, you know, this atmosphere. The facts in Edmonds, where they were seeking higher wages, they were prepared to—and if I remember correctly, they did— explode a whole factory or something like that. But even that egregious activity did not violate the Hobbs Act, right? That's why it's a different case, Your Honor. There was a collective bargaining agreement. Edmonds did carve out that exception to Hobbs Act liability. I don't recall anything in Edmonds that said it was limited to situations where there is a collective bargaining agreement. Well, if I'm reading from the First Circuit's most recent opinion of Burho, which we notified the court of in our 28-J letter, they talk about exactly that, that the Edmonds analysis of the importance of legitimacy at the end sought to be the wrongful inquiry, whether or not it's applicable beyond cases in which violence occurs during a lawful strike. And they cite the First Circuit case, they cite a Sixth Circuit case, they cite two Sixth Circuit cases in the Third Circuit, all finding that the reasoning in Edmonds was obviously and explicitly tied to the labor context and, more specifically, the strike context. Not with regard to Count 1. No, we have no, I'm sorry, right, we have no cross-appeal. We have no cross-appeal. And with regard to Count 1, Edmonds does not come into play, in my opinion, or as I stated in my brief, hopefully more eloquently. But the end of this decision is strictly limited to the facts of strikes and the collective bargaining agreement context. Here, with regard to Count 2, however, that's where some of it came in because then we started talking about what it means to be, the property to be unwanted, or the work, rather, I'm sorry, the work sought to be unwanted, unnecessary, and superfluous. And this is where the district court kind of came up with its own theory on how that worked and sort of twisted, I mean, Edmonds doesn't answer that question. Right, and notably those included, the acts, the overt acts regarding EarthTech and, I'm sorry, EarthTech and OSC were also those acts relating to the wrongful acts. Do you have a cross-appeal on that? No, there's no reason to, Your Honor. We have a- I thought you were referring to the Head Start. You're saying there's enough of the Head Start, there's many cases where Count 2, based on the legal testimony, or something else, where you said there are 75 overt acts that are still being processed, or is that an over-agreement? Well, I guess first, yes, that is what I argued in the brief. And second, I would say that there is no proof of an overt act required, and I think that's important to keep in mind. With regard to the Hobbs Act liability under that Count 2, there's no proof, and it was also charged as attempt. So that's where I think the district court went a little off, I think it went off track here, because here we had EarthTech and OSC who said, no, we're not going to use you. They tried, they offered- I'm just trying to understand the actual provisions of the Head Start, I mean, it's not an overt act, it's a liability, and I'm just trying to understand, when are we going to apply a liability under that law in light of what's been discussed? Well, frankly, I think, thank you, Your Honor, I think that the court did that in its questioning of my opponent, that with regard to that count, it was a conspiracy, and this is defended, was known to have said, this is Turner Byrne, who appeared at meetings with prospective employers and said, it's 100% union or nothing, when they tried to make concessions, when they tried to offer, he said no. So it is an- Was there anything that was created that also applied to that? They were one of the prospective employers, correct. They were approached by a union employee and asked to put somebody on a job that was a switch-on, switch-off job. They said no, and so the next thing that happens is damage to the equipment. So I think that that, in the context of- Right, but he did not need to do that. Again, that's an overt, the overt act, proof of the overt act is not necessary to sustain a conviction in the count, to- With regard to- That's where I was going, thank you. With regard to the Norris LaGuardia, if I missed it in my responsive brief, then it's on me, but I do believe that this court can affirm on any basis supported by the record, and in the record, the district court quite clearly found that here where it wasn't, Norris LaGuardia protects a union from being charged without activities as a defendant, without certain acts of the union having notified, or ratified, rather, the conduct of their employees. Here, it's sort of, it's twisted, because here we didn't charge the union as a defendant. Certainly the union is, you know, their presence is important in this case, but the Norris LaGuardia act says that we can't charge the union without explicit activity on behalf of the union. So the argument- Right, if you didn't have somebody who was intimately involved in the conduct, here we have somebody who is charged individually as having created this, as having encouraged and created and directed his co-conspirators as to the tactics that they should undertake to try to force the hand, to try and burn, to try and burn these employers, these prospective employers. Right, but this wasn't, my time's about to run out if I can answer, if, oh I'm sorry, if the union, as the president of the union solely, then that's where we are with Norris LaGuardia. The district court addressed it in the record at page 442 of the appellant's appendix, and there found that there has to be, right, some involvement, but here we have somebody who's charged independently of their role in the union. In fact, they're charged not as, they're charged because of their role as a conspirator and a member of the enterprise. So that's different, that's where Norris, so the argument that was made before was that we incorrectly, the argument before the district court that was made was that we incorrectly charged the union, we incorrectly included the union, Norris LaGuardia prevented it. But now, right, now the argument suddenly is that, I mean before this court, it's a new argument before this court, that we incorrectly charged him individually. Well, I actually think that the district court did a job, did a nice job in the record at pages 95 to 101 of the appellant's appendix, where the district court actually excluded certain types of property that the government had initially charged, and they excluded the right to make decisions, which is sort of what I heard my opponent saying when he was up here, but they also excluded the property in the form of the employee's jobs, the individual non-union employee's jobs, wages, and benefits. What the district court did retain, though, was the wages and benefits pursuant to labor contract, and explains that labor contracts can indeed be transferred, and that's reinforced in the motion for reconsideration at A104, the record at 104, where the district court again says that collective bargaining terms may be enforced against the successor, it could transfer to a third party. So talking about... Well, it was, the Supreme Court did. I'm not sure that this court did. In John Wiley and Sons, it's a 1964 case, it's quoted at the record at 104. I'm sorry that I don't know if this court has said that explicitly, but the second part was that the district court also left in the wages and benefits for unwanted, unnecessary, and superfluous labor, and that's eminence. So with regard to Seeker, I think that that's just misplaced here. That's exactly what the Hobbs Act was intended, and it goes back to the Anti-Racketeering Act of, you know, just after the Great Depression, and they were trying to, you know, unions were trying to obtain rightfully paid jobs for their members, but where they drew the line was at the use of violence, and the use of coercive and extortionist methods. So when we view it in that context, that's no better than what happened, that's exactly what happened here. We had no collective bargaining agreement, no agreement with employers, no unionization within the employees of these in the Western District of New York, and had their own people ready to go, fully trained, and didn't need and didn't want the employees that were being offered by the union. With regard to that, if I could just note one more thing with regard to the insinuation that the employers, with regard to training, the employers clearly had in mind the use of their own employees, that their own employees were needed and necessary for this work and not folks from the local union hall, and that's established in the record, the government appendix at pages 19 through 22, which is the testimony of Mr. Williams, and the appendix, I'm sorry, the government appendix at pages 286 to 292 and 340, where they were quite insistent that they wanted their people to do the work because they were uniquely trained and qualified to do this important remediation work. No other questions? Thank you. Judge, when you asked whether or not the Norris LaGuardia Act had been raised below and whether then we'd ask for instruction on that, having thought about it, I'm fairly certain that we did, and I don't know that it's part of our appendix, though, so I will endeavor to identify that, and if it's appropriate under the rule, I'll submit something to the court to confirm that. Will do. I want to say one thing about the labor exception for activity in pursuit of legitimate union objectives under the New York penal law, because I don't think we talked about that much. The district court ultimately got it mostly right about the labor exception when it addressed it to the Hobbs Act, but didn't quite get there under the New York penal law, and I think ultimately we have to look at the court of appeals, the New York court of appeals case and people, the LaGuardia, and in that case, there was an allegation that a union, it was a Teamsters union, was attempting to get a contract with a certain employer, and the court, the highest court in New York State, in that case said that the conduct became extortionate not when the union threatened to shut that business down, not when the union threatened to have pickets that would prevent any delivery from coming in or out of that business, which would have been devastating for that business. It's a really extreme form of economic pressure. That was okay, according to the court of appeals. It was when the affiliated so-called PR firm demanded a cash payment of $3,500 that the court of appeals said, now, that's extortion, and that's what, that's what, that's the difference under the New York penal law then and now. That's the difference. It was, but it's never been the statute that contains this exception, nor is it the statute that contains the exception when we're talking about the Hobbs Act. It's the case law, and D'Aguardia's never been overruled. It applies with equal force now as then. In the most recent, and there's not a lot of these cases, I recognize this, it doesn't come up a lot in New York courts, but as recently as 2005, we had the Supreme Court in Kings County citing to Edmonds, citing to D'Aguardia and Ford and the other cases that are, that created this exception under the New York penal law, and citing them with approval saying that those are still good law, and that's, that's under the current statute. So I don't think there's any question that the New York penal law contains this exception, not because it's written into the statute itself, but because the courts have said so. Thank you.